The State v. Brainard.

THE STATE v. BRAINARD.

Instructions: IN CRIMINAL CASE: DUTY OF JUDGE TO GIVE. In a criminal prosecution for a high offense, where the cause is complicated, it is the duty of the District Court before whom the cause is being tried, whether requested by counsel or not, to point out to the jury the controverted questions of fact, and to see that the law applicable thereto is given to the jury in proper instructions. And where this is not done, and it is doubtful whether the verdict against the defendant effectuates justice, a new trial will be awarded.

*Appeal from Blackhawk District Court.*

MONDAY, OCTOBER 26.

UTTERING FORGED NOTE: INSTRUCTIONS: EVIDENCE.—The indictment alleges, that the defendant, on the 15th day of June, 1865, did utter and publish as true, a certain false, forged and counterfeit promissory note, well knowing, etc., dated August 5, 1856, for $179, payable on demand to the defendant, and purporting to be signed by one Austin Brainard, as maker. From a judgment on a verdict of guilty, the defendant appeals.

*Barker & Shields, T. S. Wilson* and *S. P. Brainard* for the appellant.

*Henry O'Connor*, Attorney-General, for the State.

DILLON, Ch. J. — The record presents, in some respects, a most remarkable cause. The only evidence against the

defendant, save that of certain experts, was given by his two uncles and *his own father*. One of these uncles resides in Wisconsin, the other in Massachusetts, and the father in Ohio. By some or all of these the prosecution was instituted, and all of them appeared voluntarily to testify against the defendant.

What motive led the father, on his own motion and without any compulsion, to come from Ohio to Iowa to aid in the conviction of his son, does not appear in the record, and seems difficult to conjecture. Certain it is, that the testimony of the father was the strongest against the defendant of any produced at the trial.

It is essential to an understanding of the case, that some of the facts presented by the record, and the substance of the testimony be briefly stated.

The defendant was indicted for uttering and publishing the forged signature of his uncle, Austin Brainard.

It is undisputed that Austin and the defendant, then quite a young man, first came to Iowa, in the summer of 1856, to buy property. Austin was quite advanced in years, unmarried, and possessed of some means. He seems to have been attached to the defendant, and was anxious to aid him, and to establish him in business. The defendant was without money of his own. Lands were entered and other property purchased in Mitchell county, and in some others, in which it seems that the defendant had, or was to have, by understanding with his uncle, some interest. The defendant remained in Iowa and had charge of the property purchased, but the uncle returned. This was in 1856. The next year (1857) the uncle again came to Iowa, remained a short time, and returned. The evidence does not show that he ever again visited Iowa; but it does show that he kept up a constant correspondence with the defendant, who had charge of the business in Iowa, until his death in September, 1862.

In 1863, Martin Brainard, as administrator of the estate of Austin Brainard, brought a suit in Iowa against the defendant on four promissory notes dated in 1856, 1858 and 1861. The defendant, in his answer, pleaded, by way of set-off, certain notes purporting to be made by Austin B. to him — one for $179 (the one involved in the present appeal), one for $325, dated in June, 1857, and one for $550, dated in July, 1857. On the trial of the civil suit these notes were offered in evidence to support the set-off; but whether admitted, or, if admitted, whether they were allowed by the jury, is nowhere shown by the record. Soon after the civil cause was disposed of, the present indictment was found.

On the trial of the indictment, the State proved by the clerk of the District Court, that, on the trial of the civil action before referred to, the defendant produced and offered in evidence the note mentioned in the indictment, as a set-off to the plaintiff's claim against him.

The next witness produced by the State was Martin Brainard, uncle to defendant, and administrator of Austin B.'s estate.

He testified, that he was a brother of Austin, was familiar with his handwriting, had corresponded with him from 1825 till 1855, when he came to live with witness, and had since often seen him write. He said: "I can't tell who wrote the signature to the $179 note; I don't think it was Austin's; I think the body was written by the defendant; I never knew Austin to give a note but what he wrote the body of it." As to the other two notes offered in evidence in the civil cause, he also testified that " he did not believe them to be genuine signatures of Austin; there is a flourish in the signatures which I never saw in the genuine." This is the substance of all his testimony in chief as to the genuineness of the notes. On cross-examination, he gives his reasons in detail, based

upon the form of particular letters in the signatures, why he knows or thinks the notes to be forged.

And yet, after this detailed statement of his reasons for believing the signatures in question not to be genuine, the signature to the note was shown him, the body being covered up, and he pronounced it to be genuine. And in like manner he pronounced to be genuine the other two notes, which he had previously testified to be, in his opinon, forgeries.

The State then produced three witnesses as experts, who, from comparison with standard signatures, testified their opinion to be, that the disputed signatures were not the genuine signatures of Austin ; and yet these witnesses, on cross-examination, gave their opinion that certain other signatures were not those of Austin B., which were clearly and undeniably shown to be so.

The State next produced as a witness Almond Brainard, an uncle of the defendant, a lawyer by profession, residing in Massachusetts, who testified to his knowledge of Austin's handwriting, and gave his opinion, based upon this knowledge and the form of the several letters of his signature, that the disputed notes were not signed by Austin. And yet this witness testifies that a certain signature of Austin's was not genuine, which was incontestably shown to be in his proper handwriting.

The next and last witness for the State, was the aged father of the defendant. He gave no opinion to the jury, as to the signatures ; but detailed a conversation which the defendant had with him soon after Austin's death, in which he proposed that they should get hold of Austin's property.

The father refused to be a party to any such scheme. The defendant insisted that his uncle Austin had given him deeds and notes, and that he could hold the property. The father's testimony continues : " He showed me some

notes that he got of his uncle Austin. I pronounced the notes, at the time I saw them, forged notes. He said, "there was uncle's name, and how could they be forged notes?" Before he went away, he came to me and said, "Father, I can't bear to see you feel so badly, and I have made up my mind to present those claims to the administrator, and if they are allowed they will be very thankfully received, but if they do not allow them I will give them up, and will not go into law about it. Defendant told me Austin had given him these notes, and a deed to the land."

This was the State's case, and it is to be noted that no witness produced by the State gave any direct or positive evidence of the alleged forgery of the uncle's signature, but each of them, unless we except the father, simply gave evidence of his opinion as to the genuiness or otherwise, of the various signatures.

The defendant then produced three witnesses, who testified as experts, and gave their opinion to the jury that the disputed signatures to the notes were genuine.

Judge Parish, who had known Austin from childhood, had corresponded with him, and done business for him, gave a similar opinion, saying, "I have no more doubt that the signatures to the notes are genuine, than I have of my own." The only other evidence, except certain letters offered by the defendant, was the deposition of Chandler Severance of Ohio. It appears that this witness was with Austin and the defendant when they came to Iowa in 1856, to purchase lands.

The eighth interrogatory to this witness, was this: "Do you know of Austin B. giving to the defendant any note or notes for the payment of money? If so, state the amounts, and how you obtained your knowledge. Answer. About five years ago, I saw in the possession of the defendant, three or four notes against Austin B.,

one for $2,000; I do not recollect the size of the others. Also, one other note, signed by Austin B., upon which to obtain money, with the amount left blank, and to be filled up by the defendant."

The nineteenth interrogatory was this : " Have you any knowledge of Austin Brainard giving to the defendant his note or notes for the purpose of assisting him in his business, or for any other purpose ? " The witness answered : " I have known Austin Brainard to give to the defendant, his note in blank, upon which to raise money. I did not see Austin write the note, but believe it to be his handwriting. * * I am acquainted with his handwriting, have received letters from him, and held notes against him, which were written and signed by him in my presence."

It will thus be seen that the evidence was not incidentally given, but was elicited in answer to questions put to the witness on this very subject.

The following are the only instructions given to the jury:

*Instruction for the State :*

" If you find that the defendant was in possession of the note in question and uttered the same, and that it was false and forged, the presumption of law is that he knew it to be forged."

*Instructions for defendant :*

" Defendant asks the court to instruct the jury :

" 1. If Austin B., deceased, gave the note, alleged to be forged, to defendant, the uttering of the same is not a criminal offense." Given.

" 2. There must be more than a presumption to authorize a verdict of guilty." Given.

" 3. Circumstantial evidence to justify conviction must be absolutely inconsistent with any hypothesis other than that of the guilt of the accused." Altered by the court

adding, "that is, reasonable hypothesis on the whole evidence."

"4. If the jury have any reasonable doubt of the defendant's guilt, it must be resolved in his favor." Altered by the courts adding, "provided such doubt arise from a failure of the evidence to satisfy the mind of the guilt of the defendant." Given as altered.

The defendant excepted to the alterations, and made a motion for a new trial upon various grounds, including one that the verdict was against the law and the evidence.

This motion was denied, and judgment sentencing the defendant to two years in the penitentiary was rendered.

Under these circumstances, we believe it to be our duty to award the defendant a new trial, because of the failure INSTRUCTIONS: of the court to call the attention of the jury in criminal case: duty of to, and to instruct them respecting, the law court to give. applicable to the offense with which the defendant was charged, and particularly the utter failure to give any directions concerning a line of defense, of which there was certainly evidence sufficient to require it to be considered and passed upon by the jury.

The court gave no charge of its own. It is not bound to do so if the law applicable is intelligibly and properly presented in the instructions of counsel.

But, if these are defective and insufficient, and the cause is complicated, or the law applicable to it not to be supposed to be within the knowledge of jurymen, and particularly if the trial is of a charge of a high criminal offense, it is the duty of the court to point out to the jury the controverted questions of fact, and to see that the law applicable thereto is given to the jury either in the instructions of counsel or in its own charge.

Without further extension of this line of remark, we refer to our views on this subject as expressed in *Owen* v. *Owen*, 22 Iowa, 270; *State* v. *Benham*, 23 id. 154.

Not to emphasize the total omission of the court to state to the jury the nature of the charge against the defendant and what evidence is required to sustain it, we remark, that there was evidence sufficient to be considered by the jury, that the deceased uncle whose name was claimed to have been forged by the defendant, had, when in Iowa in 1856 or 1857 (the date of the notes claimed to be forgeries), intrusted the defendant with his blank signatures upon which to raise money, or to facilitate the defendant in making or effecting purchases of property in the uncle's absence; and there were circumstances (aside from resemblance of the signatures in question to the signatures of the uncle), proper to be considered by the jury, tending to show that the notes claimed to be forgeries had been filled up over the blank signatures of the uncle.

That the uncle owed the defendant the amount of these notes is very clearly negatived by the correspondence.

That the uncle ever gave — that is, made a present of — these notes to the defendant, is a position which finds very little, if any, support in the evidence as it comes before us. That the defendant, in using, or endeavoring to use, the note in question and others as evidence of a real indebtedness from the uncle to him, was guilty of ingratitude and fraud, may readily be admitted, and doubtless had great prejudicial weight against him with the jury.

But ingratitude and fraud are not forgery, or the offense for which the defendant was on trial.

It would be but too natural for the jury to lean strongly against the defendant in consequence of his claiming the notes in question to represent an actual indebtedness, and his endeavors, perhaps successful, to use them as *bona fide* instruments in the civil action. How natural for the jury to reason and to say, the uncle owed the defendant

nothing, and hence if the defendant has his notes he must have forged them.

If the defense had been based alone upon the proposition, that these notes evidenced a real indebtedness, this course of reasoning would be proper and entitled to great force. But another defense was that the signatures in question had been written by the uncle and delivered to the defendant in blank.

This defense finds support in the positive testimony of Severance, in the appearance of the paper on which the notes are written, and in other circumstances.

How much support it thus finds is for the jury to decide. But upon this defense the state of accounts between the defendant and his uncle, the indebtedness of the former to the latter, no matter how clear or to what extent, are matters of no moment.

If the defendant had any defense, it was this, and in some way the attention of the jury should have been directed to it, and the law respecting it stated to them either in the charge of the court or the instructions of counsel.

It ought, perhaps, to be remarked, that the experienced counsel who argued the appeal in this court are shown by the record not to have assisted at the trial.

It may be urged against this position, that it was the duty of the defendant's counsel to have asked instructions on this subject, and if he failed to do so, he must take the consequences. We answer this position by quoting from *Owen* v. *Owen* (22 Iowa, 270, 274): "Such a view does not accord with our conception of the functions and duty of the judge. He should see that every case goes to the jury, so that they have clear and intelligent notions of precisely what it is that they are to decide. His charge is their chart and compass. * * * Although the case was submitted in hotchpotch, still we should

not, for this reason, have reversed the judgment, if the result were one which, beyond all controversy, effectuated justice." And, generally, we may remark, as the result of our observation and experience, that unsatisfactory verdicts can generally be traced to defective instructions.

It is made the duty of this court to decide criminal appeals according to the very justice of the case as shown by the record, without regard to technical errors. It does not harmonize with the humane spirit of this statute to lay down the iron rule that the defendant must inevitably and in all cases be visited with the consequences of the omissions or errors of counsel. Such a doctrine, I feel bound to say, belongs to the days of Lord Coke, and is abhorrent to all my notions of justice. To prevent misconception, it is deemed proper to observe, that if the verdict in this case had been the result of evidence concerning whose force and sufficiency no reasonable question could exist, we would not reverse a judgment based thereon, for an omission on the part of the court to give proper instructions, not being thereto requested by counsel. It would then appear that a right result had been reached notwithstanding the failure to instruct.

Considering that every witness produced by the State made a mistake in the course of his evidence respecting the authenticity of signatures of the uncle; that the experts divided about equally and differed as usual; that on examination of the disputed signatures and comparison with standard signatures, the members of this court are unwilling to take the decision of the question of genuineness from the constitutional tribunal — the jury — and to make their own opinion as experts, whatever that might be, control the result; that the nature of the offense and the evidence required to establish it were not adverted to by the court below, which wholly failed to instruct the

jury respecting material matters of defense, a majority of the court are of opinion, that the defendant is entitled to a new trial, and that the District Court erred in refusing his motion made to obtain it.

My brothers, Justices COLE and BECK, desire me to add, that they concur in the foregoing opinion, and also place their concurrence in the judgment of reversal upon the distinct ground, that, in their opinion, the verdict of the jury is not supported by the evidence, and hence the court erred in overruling the motion for a new trial.

The judgment of the District Court is accordingly reversed, and the cause remanded for a new trial.

Reversed.

WRIGHT, J. (dissenting). — Aside from an objection to the conduct of the jury, after retiring to consider their verdict (which objection we all agree is without weight), counsel in argument before us, made but one point, and that was, that the verdict was against the evidence, or rather, that there was no evidence to warrant the conviction. And to this point alone they directed the main part of their argument.

The foregoing opinion fails, in effect, to find for defendant on this point, and still reverses the judgment upon a ground not made, and for an error which the court below never had an opportunity to correct. For reasons which I feel bound to briefly state, I cannot concur in this conclusion. In the first place, I remark, that I entertain no reasonable doubt as to the sufficiency of the evidence to warrant this conviction. And, so holding, I would have no difficulty, even under the rule laid down by the majority opinion, in disregarding the omission of the court below to give full and proper instructions. But, in my opinion, as the case stands, I have only to inquire whether

The State v. Brainard.

the jury had evidence sufficient to justify the verdict. And of this I entertain no doubt whatever. There was conflict, I concede. The case was warmly contested. There are circumstances aside from the mere opinion of experts, or those familiar with Austin Brainard's handwriting, tending to show defendant's guilt. To these, and to the testimony at length I might and would refer if necessary. The case goes off upon other grounds, however, and to these I direct my attention. It is said, that there was evidence tending to show, that the signatures in question were written by the uncle and delivered to the defendant in blank ; that if he had any defense it was this, and that in some way the jury should have been directed to it, and the law on this subject called to their attention.

I am probably not mistaken in saying that, if this had been done, the judgment would have remained undisturbed.

The practice and rule recognized by this view of the case I cannot sustain, and hence my dissent.

I concede the duty to decide criminal appeals according to the very justice of the matter. But I am not at liberty to disregard well established rules upon some vague conception that possibly there has not been a fair, deliberate trial. I assume, that counsel, familiar with their client's cause, and of the true grounds of his defense, know what line of policy to pursue, and it is not for me to find fault with it, nor to give a new trial to enable them to investigate a point, which, if insisted upon in argument before the jury, they never in any manner called to the attention of the court. I may legitimately, and must properly, search the record to sustain a judgment, but no court should indulge in presumptions to find error. It is no part of my duty to help out the mistakes of counsel. And now, turning to the case, I

repeat, that counsel, in their argument, never even sug-gested that the court below should have directed the attention of the jury to the evidence tending to show that the uncle delivered to the defendant his blank signa-tures. They never even remotely hinted that they were prejudiced by this failure.

Then again, they asked no instructions upon this sub-ject. The rule was settled as early as 1851 (*McCausland* v. *Cressap*, 3 G. Greene, 161), that if the court's charge is not sufficiently explained, the attorney should ask more explicit instructions. And this rule, so far from being departed from, has been directly recognized in more cases than one. See *Ault* v. *Sloan* (4 Iowa, 508), and *Miller* v. *Bryan* (3 id. 58), where it was held, that, if an instruction is given which is not erroneous, but which does not as fully state the law as it might be made to do, by a quali-fication, a party cannot complain if he fails to ask such qualification. So in *The State* v. *Tweedy* (11 Iowa, 350), it was said, that, when a general rule was correctly given by the instructions, but without qualifications which were claimed to be material under the actual circumstances of the case, it will not be considered error unless such quali-fications were asked by the party complaining, and re-fused. In another case, where the court below grouped the facts on one side, and said that these, if shown, would make out the offense, it was held that the facts thus grouped were all against the defendant, yet the method adopted was not erroneous, as it was competent for the defendant to ask and have given an instruction grouping the facts in his favor. *The State* v. *Carnahan*, 17 Iowa, 256 ; and see, further, *Davenport* v. *Cummings*, 15 id. 219 ; *Eyser* v. *Weissgerber*, 2 id. 463. Other cases might be cited, but these are sufficient to show the uniform prac-tice of this court. And this practice and the correctness of these views, I may add, find most abundant support in

The State v. Brainard.

still other rules which have almost become axiomatic in this court. Thus, questions not raised in and passed upon by the District Court cannot be reviewed here. Exceptions must be taken at the time, and error and prejudice must affirmatively appear. So again, errors are not favorably regarded which are based upon the negligence of the party urging them. The court is only bound to decide questions raised, and the neglect of the complaining party is never an available ground of error. Every presumpiton will be indulged in favor of the judgment below, and a state of facts will not be presumed in order to find error.

I shall not stop to cite the many authorities — found in almost every volume of our Reports, and, indeed, of every State — to sustain propositions so plain. Nor shall I, to justify the equally clear proposition, that parties accused are in this court bound by the line of defense assumed for them by their counsel in the court below, and that it is no part of our duty to grant a new trial because we may conceive they were mistaken as to the true points of their case. Or, applying this last thought to the case before us, as counsel esteemed it safer for their client's interest to put his defense on other grounds, and asked no instruction upon the defense which the majority says is the only one he has, if any, I prefer to leave them to determine that, instead of taking the case out of their hands. They doubtless had good reasons for failing to call the attention of the jury, in the instructions, to this part of the evidence. They, beyond question, esteemed it untenable, else they would have claimed advantage from it. When the case is retried, I can only conclude that counsel, as they did on the first trial, will put their defense upon the single ground, that these notes are genuine, that they are the defendant's property, given to him for a good and valuable consideration. This has been his claim, persistently

urged from the beginning, and the testimony as to his having notes signed in blank, was at no time, as far as I can see, relied upon as a defense. Indeed, the testimony on this subject seems to be rather incidental — elicited without purpose, rather than as a fact having any material weight in the case.

But I am referred to *Owen* v. *Same* (22 Iowa, 270), and the *State* v. *Benham* (23 id. 154), as justifying the disposition made of this case by a majority of the court. In the first case there was an entire agreement on the part of the court, that the verdict did not effectuate justice; no instructions whatever were given; the case was complicated, involving legal questions novel in their character, and unsettled in this State; the motion for a new trial was based in part upon the ground, that, from the nature and amount of the controversy it was apparent that justice had not been done; and it was expressly held, that the judgment would not have been reversed if the result had been correct under the testimony. So the second case " was peculiar, and in view of the evidence, not a little difficult, and there was special necessity for great care in the instructions to the jury." And yet, I understand the judgment below was reversed because the charge of the court was, in one or more instances, erroneous, or calculated to mislead the jury. Now, in this case there is nothing complicated, no question involved not reasonably well settled. The line of defense was, that these notes were made by the uncle. The State claimed that the signatures were not genuine. Here was a simple, plain issue of fact, and upon it the case went to the jury. To this question, and this alone, the defendant directed his instructions. To these instructions, as modified, there is no semblance of objection. But after the jury, upon the whole testimony, found for the State; after the counsel were fully heard before the

court upon the motion for a new trial (which contained no suggestion that the instructions were not sufficiently full and specific); after they have urged a reversal because the verdict was against the evidence, the case is reversed and remanded upon another ground — a ground which, it seems to me, offers a premium for negligence, is calculated to mislead and entrap parties, and which can only tend to protract litigation, and render the administration of justice uncertain. For I am sure I cannot tell how much a judge, when not requested, should say to a jury; how specific he must be in his charge; how much he must assume for the negligence or mistakes of counsel, to meet the rule which leads to this reversal. The plainer and safer rule is, unless satisfied that injustice has been done or will result from allowing the verdict to stand, to conclude that counsel put the case to the jury upon their instructions in the manner which they conceived best calculated to subserve the interests of their client; and not to presume they were mistaken, and that the court failed in the discharge of its duty. If the result is unjust, if the conclusion is unwarranted, let us say so, and not award a new trial to have investigated a question which counsel, in the exercise of their best judgment, and with a full knowledge of all the facts — facts which they knew and we cannot know — have thus far deemed of no importance.

For these reasons I cannot concur in the foregoing opinion. I think the conviction, upon the record, was right, and should not have been disturbed.