# CHARLESTON.

## STATE *v.* CADDLE.

Submitted February 9, 1891.—Decided March 11, 1891.

35  73
40  721

35  73
44  530

35  73
63  672

1 BURGLARY—INTENT.

To constitute the *animus furandi*, the thing must be taken unlawfully without fair claim of right, with intent to appropriate so as to deprive the owner of it permanently.

2. BURGLARY.

*Lucri causa*, does not form an essential element of larceny.

3. BURGLARY.

*Quære :* Does a mere *bona fide* claim of right to the thing itself exclude larceny, if there is no such claim of right to do the act by which it is obtained.

4. INSTRUCTION.

As a general rule of practice in this State, failure by the trial court to correct and give as corrected an improper instruction asked is not error.

*J. W. McCreery* for plaintiffs in error, cited 31 W. Va. 491.

*Atty. Gen. Alfred Caldwell* for the State, cited Mayo's Guide 146; 9 W. Va. 456; 31 W. Va. 491; 22 W. Va. 766; 27 W. Va. 375; 31 W. Va. 355; 2 Bish. Crim. Law (3rd Ed.) c. 36; 2 East P. C. 553; Id. § 864; 1 Hawk. P. C. 134; Whar. Crim. Law (8th Ed.) § 895; Rose. Crim. Ev. 468; 2 Russ. Cr. 102; 57 Am. Dec. 274; 19 Nev. 135; 64 Miss. 77; 60 Miss. 638; 52 Ala. 411; 10 Gratt. 758; 2 Bish. Cr. Law (3rd Ed.) § 99; 33 W. Va. 319; 32 W. Va. 183; 26 W. Va. 338; 1 H. & M. 385; 33 W. Va. 81; 14 Gratt. 613; 8 Gratt. 637; 11 Gratt. 431; 21 Gratt. 212; 22 Gratt. 947; 28 Gratt. 383; 31 Gratt. 343; Id. 469; 78 Va. 674; 20 W. Va.

32; 24 W. Va. 356; T. & M. Juries § 363; 4 Min. Inst. E't 1761; 3 G. & W. New Trial 1428; 11 W. Va. 703; 31 W. Va. 442.

HOLT, JUDGE:

The grand jury of Raleigh county, at the October term, 1889, of the Circuit Court, found a joint indictment against Jack Caddle and David Reed for burglary. The indictment was demurred to, and the demurrer overruled. During the progress of the trial sundry exceptions were taken to the rulings of the court, based upon instructions and the refusal of the court to set aside the verdict of the jury and award a new trial to the prisoners, whom the jury had found guilty. On the 30th of July, 1890, the court entered judgment upon the verdict of the jury and sentenced the prisoners to the penitentiary for five years. From this judgment of the Circuit Court the case has been brought here on a writ of error.

The first error assigned is that the court should have sustained the demurrer to the indictment. No defect is pointed out by prisoners' counsel in this Court; nor does the record disclose that any defect was specifically relied on in the court below. The indictment is in the form sanctioned by Mr. Bishop; and we think the Circuit Court did not err in overruling the demurrer. The indictment avers each essential element of the crime with all the circumstantiality of time, place, value, ownership, description *etc.*, that is requisite.

The instructions offered by the prisoners and refused by the court were the following: Instruction No. 1. "The court instructs the jury that before they can find the prisoners guilty they must believe the state has proven beyond all reasonable doubt that the prisoners burglariously and feloniously did break and enter the dwelling house of Armis Meadows, with intent to despoil the said Armis Meadows of the whisky or brandy or a part of it, as charged in the indictment, without his consent, for the sake of gain." Instruction No. 2. "Before the jury can find the prisoners guilty, they must believe from the evidence that the prisoners in the night-time did break and enter the dwell-

ing-house of Armis Meadows, with a felonious intent to take, steal, and carry away the goods and chattels of said Armis Meadows, without his consent, with the intention of despoiling him, the said Meadows, thereof for the sake of gain."

The indictment was as follows: "The grand jurors of the state of West Virginia, in and for the body of the county of Raleigh, and now attending the said court, upon their oaths present that Jack Caddle and David Reed, on the 1st day of January, 1888, in the county aforesaid, did about the hour of ten o'clock in the night of that day feloniously and burglariously break and enter into the dwelling-house of one Armis Meadows, situated in the said county, with intent the goods and chattels of him, the said Armis Meadows, in the said dwelling-house then and there being, then and there feloniously and burglariously to steal, take, and carry away, and one gallon of whisky, of the value of two dollars, and one gallon of brandy of the value of two dollars, and one quart of whisky of the value of one dollar, and one quart of brandy of the value of one dollar, and one pint of whisky of the value of fifty cents, and one pint of brandy of the value of fifty cents, of the goods and chattels of the said Armis Meadows, in the said dwelling-house in the county aforesaid, then and there being found, then and there feloniously and burglariously did steal, take, and carry away, against the peace and dignity of the state. Found at the October term of said court, 1889, upon the information of Cora Meadows and G. W. Cole, sworn in court, and sent before the grand jury to give evidence to that body. A. P. FARLEY, Prosecuting Attorney."

The above indictment was indorsed: "A true bill. ADEN THOMPSON, Foreman."

All the evidence is set out in the bill of exceptions, and in this Court the facts must be taken to be as follows: Armis Meadows with his wife Cora and children resided in the county of Raleigh. In September, 1887, the husband being from home, Nelson Farley and the prisoners came to Meadow's residence in the afternoon and remained until after dark. They all left about dark, taking a torch-light with them. In about an hour the persons, who turned out

to be the prisoners, returned, stepped on the porch, and knocked at the door. Cora Meadows, the wife, opened the door, thinking it was her husband, the door being fastened on the inside, and asked him in, when the prisoner David Reed, came into the house and asked for whisky; she told him he could not have any, and in a few minutes he went out on the porch. She heard the persons talking outside the house, and one of them said: "We will have the whisky, if we have to take it at the point of the pistol." Cora Meadows, the witness, then fastened the door, and put a bedstead with bed on it against the door. About that time David Reed and Jackson Caddle, the prisoners, broke the door open, tearing off a part of the casing of the door, and walked into the house, and Reed asked for whisky. She told him that he could not have any, and Reed went back in the house between the beds and got a keg which would hold about twenty gallons, and brought it into the room, and David Reed took up the keg and poured whisky into a demijohn he had, which held about one gallon, and in doing so poured a good deal of whisky over the floor. There were between two and three gallons of whisky in the keg. The whisky they took would have been worth to her 25 cents a pint. The whisky belonged to her husband, Armis Meadows. While Reed was pouring out the whisky Jackson Caddle took a cup, caught some, and drank a little. About that time witness saw a light coming to the house, and one of the prisoners said "Well, we had better go," and started. About the time they left the house, George W. Cole came with a torch-light in his hand. Prisoners did not tell witness that they had bought the whisky from her husband, nor that he told them to go there to get whisky. Armis Meadows, her husband, kept whisky about his house. This was in Raleigh county, at the house of Armis Meadows, within a year before the finding of the indictment. There were from two to three gallons of whisky taken by the prisoners with what was spilt on the floor. George W. Cole, spoken of by Cora Meadows, went to the house of Meadows some time after dark, with a torch-light in his hand; met two men; recognized prisoner Caddle as one. The prisoners were then leav-

ing the house. Some one, from the direction the prisoners were going, threw a stone, which knocked the light out of his hand near the door. He turned to follow, and they ran, one of them saying: "We are the James boys." He, Cole, followed a short distance, then returned to the house, found casing of the door torn off, bedstead and bed thrown about near the door, floor wet, and keg sitting near. About the time he had returned from running after the men Armis Meadows got home, and, on entering the room, after seeing the prisoners come out, he found Cora Meadows in a state of great excitement. The prisoners afterwards told that they had pushed the door open, and had gone in and taken the whisky. The prisoners were examined as witnesses on their own behalf, and said in substance that Armis Meadows owed prisoner, Reed, a pint and a half of whisky, having already given him three pints, and that "Meadows told Reed to come after night and get the balance, a pint and a half; and if he, Meadows, was not there, to go into the house and get the whisky;" that they got the whisky; did not break the door open; did not throw a stone at Cole; did not run, but walked, away; did not say they would have the whisky at the point of the pistol.

Burglary is the breaking and entering the house of another in the night-time with intent to commit a felony therein, whether the felony be actually committed or not, and is punished under our statute by confinement in the penitentiary not less than five nor more than fifteen years, the term to be fixed by the court; and the statute prescribes that if it is with intent to commit larceny he shall be deemed guilty of burglary, though the thing stolen or intended to be stolen be of less value than twenty dollars.

Should the verdict be set aside as contrary to the evidence? While the case is on trial before the jury the prisoners are presumed to be innocent, until their guilt is established beyond all reasonable doubt; but when this is done, and the jury have found them guilty, the complexion of the case is wholly changed, and the finding of the jury is taken to be true. Why should we set aside a true verdict, and hold it for naught? The prisoners must show that it is not true except in semblance and form,

and convince the judge who presided, who is only in a very restricted and narrow supervisory sense a judge of the facts and the testimony, that the jury, who are in a general sense the exclusive judges of the fact and of the weight of evidence and of the credibility of witnesses, have clearly gone astray, as they sometimes do; and such a check is indispensable, for there is sometimes a plain deviation from right and justice. Guilty men often escape, as we all know; but innocent men are more frequently convicted than is generally supposed.

In this case there is no essential element of the offence charged wholly without proof; no one on which this Court, who neither saw nor heard the witnesses, can assume to say in opposition to the jury and the court below, who both saw and heard them, that there is a clear and decided preponderance of evidence proper for it to consider against the finding of the jury.

But it is said on behalf of the prisoners that their own evidence shows a claim of right, and that this is without contradiction, and must therefore be taken by the jury to be true. It is the duty of the jury under their oaths carefully and conscientiously, in order to arrive at the truth, to weigh and consider all the evidence before them—that given by the prisoners as well as that given by those who have no occasion to subject themselves to temptation; but there is no artificial rule requiring them to believe. False in one thing, false in all, is a maxim in chancery, where the evidence is read, and not delivered before the judge by word of mouth. Still it is based in some degree on wide observation and long experience, and in courts of common-law has its natural weight and effect. As matter of law we have to take it for this occasion that these prisoners stated on their oaths quite a number of material matters untruly. I know of no rule that forbids the jury who saw and heard them from taking the same view as matter of fact.

But it is asked why did not the State call Armis Meadows to contradict them? They say, on affidavit made after the verdict, that Armis Meadows was within reach; in fact, present during the trial. It may be said in reply, if that was so important a point in exculpation or in expla-

nation of their otherwise guilty conduct, why did they not call him? It will not do to say they thought the State intended to call him. He was not the prosecuting witness, and had no personal knowledge of the facts. There came a stage in the trial when it was manifest the State did not intend to use him as a witness. Our courts in order to get at the very truth and justice in such grave matters involving life or liberty, do not refuse to hear so important a witness because he may happen not to be brought on the stand in the customary order. Were they afraid that he would tell the truth or not tell the truth?

Although it is not necessary to decide, nor intended to be decided, yet it is not at all clear as matter of law that their own story, taken for true, makes out such a claim of right as to exclude larceny or felonious intent manifested by the thing done. They set up no claim of right to all that they took, and they do not set up at all any claim of right to obtain the whisky in the manner and by the acts by which it was obtained.

The affidavit of a juryman of something said by another juryman in the jury-room need not be considered, especially as he says it did not influence him in his decision. Neither is it necessary to take up time in considering the affidavit of Lucy Caddle. If her evidence was deemed important, she ought to have been introduced as a witness on the trial. There is nothing to show why she was not, and, if this were accounted for, her evidence is not of a character to create any likelihood of changing the result.

Did the court err in refusing to give the instructions asked on behalf of the prisoners? Neither instruction asked is equivocal; neither instruction propounds correctly the law of larceny as now understood. To take the goods "for the sake of gain" is not now regarded as one of the essential elements. What matters it to the owner or to the State whether they took it for gain or not, so that they took it with the intent, without any claim of right, to deprive the owner of it permanently, by appropriating it to themselves, in order to destroy, as they did in part by pouring it out, to drink, to sell, to give away or throw away? The counsel for the prisoners, by their repetition of it evi-

dently insisted on having it put in any instruction to be given. If it was already in, explicitly or impliedly, then the instruction was wrong, for so much the stronger reason, besides having a tendency to mislead.

It is not the practice nor the duty of our courts to instruct the jury in all cases and of its own motion. The court may do so, and often does so, when it thinks the case calls for it; taking care not to instruct as to the effect of evidence, or comment on its weight. But the general practice is for instructions to be prepared and asked for in important cases; and the court, having to keep careful watch and guidance over all the many details of the trial as it goes on, is not bound to take each improper instruction, and so remodel it as to make it good law; nor in lieu thereof to instruct generally on the law of the case, though it would no doubt generally do so if asked. Counsel must look after these things themselves, and they so understand it.

The trial seems to have been a fair and impartial one, properly conducted according to the rules of law, without any error of omission or commission on the part of the learned judge who presided, as far as we can see, and the judgment must therefore be affirmed.

LUCAS, PRESIDENT, (*dissenting.*)

I am compelled to differ with the conclusion reached by the majority of the court in this case. The essence of crime is in the intent, and when we lose sight of this principle we break down all the barriers between acts which may become the subjects of civil jurisdiction in determining rights of property, and those which are the subject of criminal prosecution. In the case of larceny—as this crime always includes a trespass—the very essence of every distinction between it and unlawful and malicious trespass is in the intent. In the present case, the whole question to be determined by the jury turned upon this pivotal distinction between malicious trespass and larceny or burglary. If the goods were taken with any reasonable *bona fide* claim of right, authority or permission, then the *animus furandi* was wanting, and there could be no conviction of felony. I see nothing in the record to indicate that

the attention of the jury was ever called to this important and elementary distinction. On the contrary, their attention was diverted from it by the refusal of the court to give the second instruction asked for by the prisoner.

It is said this instruction was properly refused, because it required the jury to find that the taking was "for the cause of gain." But we must consider the instruction in connection with the evidence; and the addition of the words objected to, when applied to taking a pint of whisky under the circumstances detailed in the evidence, if erroneous at all, was perfectly harmless, and could not vitiate the previous part of the instruction, and did not justify the court in refusing the whole. I do not think the Circuit Court performed its whole duty in refusing and utterly neglecting to call the attention of the jury to the radical distinction above noted between felony and malicious mischief, which is not a question of means at all, but purely a question of intent. I do not regard the court, when sitting to decide questions between the State and a prisoner under indictment, as properly represented by a marble statue of justice, without the power of active intervention to administer the sanctions of crime in favor of the state, on the one hand, or to protect the life and liberty of the citizen on the other. If the Circuit Court thought the words "for the sake of gain" objectionable, because meaningless in the position which they occupied, it ought to have stricken them out, and have given the instruction as thus modified and corrected.

I find in a most recent authority on this subject the following description of the duty of the presiding judge in such cases: "It is the duty of the judge to see that every case so goes to the jury that they have clear and intelligent notions of the points they are to decide, and to this end he shall give necessary instructions, whether so requested by counsel or not, and his failure so to do is held ground for a new trial where the verdict was not one which effectuated justice between the parties." Sack. Instruct. Juries (Ed. 1888) § 5, c. 1, citing *Owen* v. *Owen*, 22 Ia. 270; *State* v. *Brainard*, 25 Ia. 572.

In regard to the motion for a new trial on the ground

that there was insufficient evidence to convict, it is evident that the jury totally disregarded and rejected the testimony of the defendants, who testified that they took the whisky by permission of the owner. This the jury would be at liberty to do under ordinary circumstances, but when the owner of the whisky, within whose breast alone, except prisoners', a knowledge of the facts lay, stood silently by during the trial and was never called by the State at all, the presumption is that his evidence, if produced, would be in corroboration of that already given. This principle, as applicable to a civil case of fraud, has thus been stated by this Court. "We think it is a sound rule that when a party to a suit has in his possession evidence to clear up any doubt or solve any difficulty, and he does not produce it, the presumption is that the evidence, if produced, would be in corroboration of that already given against him." *Bank* v. *Wilson*, 25 W. Va. 262. I see no reason why this rule should not apply where the state is a party, but every reason why it should. Under the circumstances, I do not think the jury was justified in totally rejecting the testimony of the two prisoners upon the vital point in the case. One of the prisoners was a youth under age, and I can not reconcile it to my views of the law and justice that he should have been sent to the penitentiary for five years for taking a few pints of whisky, under the circumstances disclosed by the record in this case. I am for reversal and a *trial de novo.*

Whether, in order to constitute larceny, the taking must be for the sake of gain, I do not regard as material in this case. But were it otherwise, I should be inclined to think that the definition of the civil law, so long adopted and endorsed by the common-law, was not to be lightly discarded: "*Furtum est contractio fraudulosa lucri facienda gratia, vel ipsius rei, vel etiam usus ejus, possessiones ve; quod lege naturali prohibitum est admittere;*" —theft is a fraudulent taking of the thing itself, the use of it or the possession, for the sake of gain; and this is prohibited by the law of nature. Just. Inst. lib. 4, tit. 1, § 1.

Mr. Bishop thinks the *causa lucri* not essential as a question of principle, though he admits the authorities are

divided. 2 Bish. Crim. Law (Ed. 1872) §§ 847, 848. Unfortunately, however, for his argument, he mistakes the meaning of the word *lucrum* when he restricts the definition to "the love of greed." *Lucrum*, as defined by Anderson's Law Dictionary, (1889) means gain, profit, advantage, benefit." The same author defines *lucri causa*, "for the sake of gain; a civil-law expression corresponding to *animus furandi* in the common-law."

But by far the most learned and satisfactory discussion of the question will be found in 1 Whart. Crim. Law, (1885) §§ 895–900. In section 899 he states what appears to me the true doctrine on principle, giving to the word *lucrum* in its more comprehensive and correct signification: "In the United States, the qualification *lucri causa* has been accepted by several courts as an unquestioned part of the common-law. Between larceny and malicious mischief, it is argued, the line is well marked. Thus it has been frequently held to be a misdemeanor of the nature of malicious mischief to kill an animal belonging to another, though it has never been held larceny so to kill and take, unless some benefit was expected by the taker. And by a series of statutes, adopted more or less extensively in all the states, malicious destruction of property are made the subjects of criminal prosecution, of which the penal consequences are widely different from those attached to larceny. * * * The severe penalties of larceny, as a system of pillage which society must put down, must be maintained in their rigor; but it will be destructive of the humanities of life to extend these penalties and infamies te every case where property is taken without the taint of selfish greed in the taker. On the other hand, it is plainly larceny when goods are intentionally taken from the owner, the object being to deprive the owner of their use and in any way to benefit the taker."

AFFIRMED.